Mr. Wendell Odom, Jr. May it please the court, my name is Wendell Odom. I represent the appellant, John Carter, in this case. I also represented Mr. Carter at the trial level. My worthy opponent at the trial level is Mr. Charlie Escher for the government. He's also here and represents the appellee today before the court. This case is an appeal off of a requested jury charge of willfulness in a criminal tax fraud case. The appellant was charged with six counts. The first count being conspiracy to willfully aid and assist in the false preparation of tax returns as a tax preparer. The counts two through six were five substantive counts that related to the actual filing of the returns that are alleged in the conspiracy count. After a jury trial, the jury acquitted the appellant as to the conspiracy count, but found him guilty on the five substantive counts. The district court judge, the Honorable Lynn Hughes, assessed a guideline-appropriate sentence of 41 months incarceration. The application of willfulness in a criminal tax case, especially a cheat construction, which is what we're talking about today, requires an evaluation of the facts of the case because it's not always appropriate in all tax cases and certainly isn't appropriate in any other case that I'm aware of. In this particular case, the facts are that the appellant, John Carter, was an accountant. He had an accounting degree from a university. He worked for Tenneco as an accountant for 16 years. After he left Tenneco, he started to generate income through tax returns. Around 2000, he did a tax return for his brother. His brother, Robert Carter, had purchased a large amount of African art and had made a charitable donation of this art to Texas Southern University. Mr. Carter did the return, and in the return, his brother asked him to, and he did make a request for a deduction based on the fair market value of the art that was given to the charitable institution, that being the university. Based upon that occurrence, Mr. Carter started a practice of either having his clients purchase or him purchasing African art and doing tax returns wherein the art would be contributed to either a university or a museum or other charitable institution. Then Mr. Carter would fill the returns out wherein he would claim the fair market value of the art as a deduction so that the clients, the taxpayers, could receive a sizable deduction off of the charitable gifts. The requirements to make a charitable deduction under the IRS were, for our purposes, essentially threefold. One, that there be an accurate appraisal of the value of the art. Two, that the art be given to a qualified charitable institution, and that those items, that appraisal and that that donation be submitted in a form, an IRS form, 8283 form. And three, that in order to declare the fair market value of the art, that the art must be possessed, the charitable art must be possessed for a period of one year prior to making the donation. If the donation is made prior to the one year, then you cannot get the fair market value. You only get the value you paid for on the art. It is interesting that in this case, the amount paid for the art was considerably less than what the appraisal said the art was worth. However, that was not an issue that was submitted by the government in its indictment or its proof as being part of the fraud in this case. The government didn't produce any evidence about whether the art existed or whether it ended up with these charitable institutions? I mean, I just didn't see anything in the record, but that wasn't part of the case at all? It wasn't that it, yes, that was not part of the case. Because reading it, I wonder did this art even exist? Did it end up at this library in South Carolina? But I didn't see any evidence the government presented about this. That's correct. That's correct. The only question was whether the timing on the art. The government had two theories of fraud in this case. One of them is the fact that the art was backdated for an inappropriate year, that instead of the charitable donation being made in 2007, it was made in 2008, or carried forward into 2009, 2010. So one of the allegations is that there was a conspiracy between Mr. Carter and a co-conspirator, an appraiser by the name of Mr. Jara, who pled guilty on a different count but on these facts, to having backdated the art, filled out the form incorrectly, saying that it was donated in 2007 when, in fact, it was donated, according to the government, in 2008. Did the co-conspirator plead guilty to a conspiracy count or some other tax-related? I think he pled guilty to a substantive count. Okay. And the other thing, just to be clear, when you listed the three elements in order to claim the deduction, as I understand it, the defendant, your client, to claim the deduction, but he was unaware that Mr. Jara was backdating the forms. Is that correct? No, Judge. He said that he was unaware that Mr. Jara was backdating the forms, but he was unaware of the one-year holding. Unaware, okay. Yes, sir. And that is the second theory of fraud, and that is that they did not wait a year to make the deduction. The defendant's defense was that in the record on page, record on appeal 543 through 569, the defendant claimed that he was totally unaware that he had to wait a year before he made the contribution, but that he did rely on Mr. Jara, his co-conspirator, to submit the art in the appropriate year, that being 2007, in order to qualify for a deduction in 2007. The, and I'm sorry, I think, yes, it was 536, 540, and 580 is where the defendant testified he did not know of the one-year rule that he had to hold the art for one year. At the conclusion of the testimony, the defendant, the appellant, requested a jury instruction, and the jury instruction that was requested is very similar to that in Cheek v. United States, and it had the objectively unreasonable language in it that said that if an appellant was not aware, that said that if an appellant had an objectively unreasonable belief in that what he was doing complied with the tax laws, then he could not be found guilty of tax fraud. Or in other words, even though a court or a jury may find that it's unreasonable for him not to have known about a certain aspect of the tax law, if he in good, honest faith believed that was the case, then he would not fulfill the qualifications of willful violation of our federal tax laws. And the instruction you wanted in your entire good-faith defense went only to that theory about the one-year holding requirement, right? Because if the government had a one-theory case just on the backdating, that would have been a he said, she said about whether your client knew about the backdating. It wasn't about his knowledge of the tax laws on that issue. That's correct, Your Honor. I believe that if all they had was a backdating theory of fraud, that I would not have been entitled to the Cheek instruction. I think that Cheek has been modified through the years, and it's pretty clear that it applies only to a very specific set of fact situations. It has been trimmed down to exclude, for example, the people that don't believe in our tax laws, tax protesters. It doesn't apply to them. Whereas originally as written, it could have been interpreted that way. It has been modified to the point that it applies to specific fact situations wherein a defendant is claiming ignorance of a particular aspect of the tax code. And there is a question as to whether that ignorance is objectively unreasonable on the defendant's part. The jury must decide that. And we are entitled or the defendant is entitled to instruction on that very issue. What is interesting about the fact scenario in this case is that this same jury instruction was appealed from Judge Hughes. The same instruction was appealed to the Fifth Circuit in the case of Montgomery that both parties cite, but that that decision was not handed down until about a month after this trial was over. So Judge Hughes did not have the benefit of the Montgomery case when we had our jury, submitted jury instructions when there was a hearing and discussion over this very issue. And Montgomery, I mean, it clearly establishes that the instruction should have been given, but it also found that the error in that case harmless, which is largely a fact-dependent determination. That's correct. But it does say one thing on the harmless error. It says that unlike the Cheek instruction, the instruction in Cheek was an inaccurate statement of the law. It said if his belief in the lawfulness of his actions is unreasonable, he can't have a good-faith defense. That's just an inaccurate statement of the law. There was an issue in Cheek. Here and in Montgomery, you just have an omission. Judge Hughes didn't tell the jury, oh, if he's unreasonable in his belief, he loses the good-faith defense. He just didn't give that additional instruction. And so Montgomery says, well, since it's really a problem of omission rather than misstating the law, you could have argued all this in closing. The instruction didn't prevent you from arguing that. So why wouldn't that same analysis hurt you on the harmless error? Because as the court pointed out in Montgomery, there was a risk that a jury could find that it was objectionably unreasonable for Mr. Carter to hold that belief. And while I can argue that, as the court in Montgomery pointed out, the defendant or the appellant in this case is denied the opportunity to have the law explained to him, to the jury, that would allow for an acquittal. It's one thing for me to argue it. It's another thing for the court to instruct the jury that, hey, you may not think it's reasonable that a tax preparer is not aware of this one-year holding rule or this fair market value rule, but if you honestly believe that he wasn't aware of it, then you must acquit. There's a big difference between me arguing it as an advocate and the judge instructing the jury that that is the standard by which they make that determination. And that is what we're asking the jury to do, or was asking the jury to do in this case, was to make that determination because the government put on a significant amount of evidence, primarily through the case agent and also in argument, how reasonable is it for a person to be engaged in the practice of tax preparation and to be making these deductions but yet not being aware of this one-year holding rule? And the question then becomes not as to how reasonable it is for the court or the average juror, but how reasonable it was whether Mr. Carter, in fact, honestly believed that or whether he is trying to deceive the jury on this particular issue. So it was being held in the wrong stake. We—there's an issue as to harmful error here. The standard is whether it could have affected the outcome in this case. We—I'm sorry. Is that provision for holding the art for a year, is that applied in other places in our tax laws? Is it a common sort of requirement for charitable donation? It is common, Judge, to claim a fair market value. It must be held for a year as in one part of the code. As it relates to a charitable deduction, it is in another part of the code. So, yes, fair market value is generally in the code that you can't declare fair market value unless you hold it for a year. There is specific provision in the charitable deduction aspect of the code that also says— Did the government argue that Mr. Carter, being an accountant, and there being such a prevalence of this holding type requirement, should have known? The government—both the case agent said that he didn't think the law was very confusing, and the government also argued that Mr. Carter, as a tax preparer, should have known about that. Yes, Judge. Then if the court feels that this was error, as did the Montgomery court, then the question becomes whether it's harmless error. We argued in our appeal that, well, because they find him not guilty on the conspiracy, that therefore it cannot be harmless. The conspiracy counts, the one that involves the appraisal, and that, therefore, the jury was convicting him based upon the hold in the art for a year. The government has responded recently, or the appellee has responded recently, with two cases saying you cannot extrapolate facts from a jury acquittal. I agree with that. But the government, when they argue that the facts in this case are overwhelming as to guilt on the backdating aspect of the case, is asking the court to do just that. The conspiracy elements in this case are the very elements that are found in both fraud cases, both the backdating aspect as well as holding it for a year. If we are to hold that the government's evidence of what they view as overwhelming guilt on the backdating is the only thing that we're to consider, we're ignoring the fact that this jury decided that the government did not meet all the elements beyond a reasonable doubt. Your time has expired. Yes, sir. Thank you, Judge. We have some time on rebuttal. Mr. Escher. May it please the Court. Charles Escher for the United States, and I was the trial lawyer below in this. As Mr. Odom stated in his stand, the claim for the cheat construction does not apply at all to the first theory of prosecution we had, that these tax returns claimed taxpayers were donating art in a year in which they didn't own the art or make any donations. The evidence is sufficient for that. Mr. Jara testified that he backdated, but even if you discounted or threw out Mr. Jara's testimony, the rest of the evidence in the case is sufficient to support that theory. For one thing, all the taxpayers testified to that fact. They didn't own any art or donate it in 2007 for the 2007 returns. By the way, one of the returns is a 2008 return, which I'll probably address later by itself. Besides the testimony of the taxpayers, there is some written evidence. Mr. Estill, on his 2007 return, paid for the art for that year's deduction in 2008. We had his check introduced in the evidence. It's Exhibit 2C. It's dated March 3, 2008. Mr. Patterson paid $5,000 down for the art in February, February 19, 2008, and that supported their testimony. They did not buy the art in 2007. The other taxpayers, Pearson and Hightower, and the remainder of Mr. Patterson's fees, were collected out of the income tax refunds they later received. So those monies weren't paid in 2007. They weren't even paid when the return was prepared. They were going to be paid to Mr. Carter if the IRS made the mistake of issuing these large income tax refunds in this case. Besides that evidence, you can look at the tax returns themselves, and it jumps out at you that these donations have to be false. For the four returns that are 2007 returns, if you look at the Form 8283 that's attached to each one of those returns, it all shows in the bottom of the second page of the form that the art was appraised on the same day, 12-11-07. It was signed by the donee on 12-11-07, same exact day on all four returns. The trouble is Mr. Jara's appraisal office is in Houston, and the art was delivered in part to Bryan, Texas, and also to St. George, South Carolina, a library up there. We missed that part in our brief. But that would have put Mr. Jara at three places on the same day, 12-11-07. And I crossed Mr. Carter about that at trial. How could Mr. Jara be three places at once? And he had no answer for that. Besides that, Mr. Carter tried to testify that he made a home equity loan of $100,000 that would have paid for some of this art, but he had to admit on cross that there were no withdrawals from his bank account when he made that home equity loan prior to these returns. Mr. Carter did not sign these tax returns, and we crossed him on that in the record on pages 580 and 81. He tried to dodge that question, and it was a clear inference that he knew he shouldn't be signing these returns. And, of course, there was the panic evidence. When the agent approached Mr. Carter about this, he didn't talk to him at first. He started shredding the forms 8283 that he had in his office. He later realized that's not going to do him any good because the 8283s are attached to the tax returns and filed with the IRS. So he explained that he just panicked. I think it's important to keep that evidence in mind with the fact that one of his clients panicked too. When Mr. Hightower was visited by the agent, he claimed he inherited all this art from his grandfather, which was a lie. And then he later went to the IRS and corrected that statement. If the client panicked and knew that was the problem on his tax return, the preparer knew too. And for the 2008 return, which I put off a minute, that was our count three. That's Mr. Estill's second return. He had the 2007 return, which is our count two, and then his 2008 return. Mr. Estill had two forms 8283 attached to his return for 2008. One of them is dated 12-11-07, just like the 07 returns. It's the wrong year on the face of the form. The art on that one, according to Mr. Jara, was delivered in July of 2008. Mr. Estill testified he didn't pay for the 2008 art until November 2008, which would keep him from having the over one-year holding period needed to take the deduction. The second 8283 in the 2008 return just claims on its face that it was donated in November of 2008, which is around the time Mr. Carter would have paid his check for that. I want to address next the notion of the acquittal on the conspiracy count. And the United States had Mr. Jara plead to a substantive count. And as I put in my 28-J letter, what that acquittal means is that we did not prove beyond a reasonable doubt one of the elements of conspiracy. And as I listened to the prior stand, I thought I should also mention to the court that if the court sees the acquittal on the conspiracy count to be an inconsistent verdict with the substantive counts, and I'm not saying it is. Committing a crime and then conspiring to commit the crime are really not the same offense. But the law in this circuit is that inconsistent verdicts are permissible because it could be explained as a jury mistake, compromise, or lenity. But he's not challenging the substantive counts on factual sufficiency or anything. What he's saying is there's this erroneous jury instruction, and then it becomes your burden to show harmless error. So why shouldn't – in deciding whether you've met your burden to show harmless error, why shouldn't we consider that there was this acquittal on this one conspiracy count? Worth considering, but I would say there may be – and I hate to speculate because those letters, that 28-J letter I mentioned – I sent in explained that we're not supposed to speculate what factual findings could have been there. But the jury could have had two other reasons for acquitting him on that conspiracy count. One reason is Mr. Jara didn't plead to a conspiracy count. The second reason is Mr. Jara didn't prepare tax returns. He filled out these Forms 82-83, but that was it. He didn't know the taxpayer's income. He didn't know what effect it would have on the return, and he's sure the devil wouldn't know whether there would be carry-forward years in which the tax deduction would be carried forward. Perhaps the jury was concerned with that. But as long as the evidence is sufficient for the substantive counts – and as I pointed out, it is sufficient for that – I'd like to address now the argument on our second theory of prosecution. That Mr. Carter claims he knew and he did not know that you had to hold the art – the taxpayer had to hold the art for more than one year before he could donate its fair market value. Besides the fact that this man had an accounting degree in which he took at least two classes in tax preparation, I think he said, and besides the fact that he worked at a very responsible job with an oil company, and he testified that at that company he had the keys to the kingdom. Besides that, the form itself tells him, when you're donating art over $20,000, to see the instructions. And there are other things he knew that are not on the face of this form or on the face of a Schedule A, which this form relates to. He knew that art could be donated only up to 50 percent of adjusted gross income. That's in the instructions. He knew that you could carry forward excess deductions for five years. That's in the instructions, not on the face of the forms. And he also knew the one-year holding period. He explained at trial that on Mr. Estill's returns on Schedule D, which deals with stocks and bonds, he knew all about the holding period for capital gains, long-term capital gains, short-term capital gains, and so forth. He tried to testify at trial that he – and he testified fully. He got to testify at full length at this and explain his whole story to the jury. And it was, I didn't know where I bought the art, who I bought it from, or how much I paid for it. He claimed he bought the art from people in the shadows. He kept no records of the art, even though he's an accountant. He couldn't explain any of that. And then he also testifies, well, I thought I signed the returns. Well, I must not have. And then he explains, I just didn't know anything about the holding period or anything. It's a convenient defense of explaining how he didn't know any of this. But when you put it in perspective, on these five tax returns, there was $1.7 million of art donated on the ones dated 12-11-07 and another $250,000, I believe it was, on the second one for Mr. Estill's 2008 return. That's $1.7 million of art that he is just giving to these clients to put on their tax returns during tax season. Half of them couldn't pay him. They were waiting to see if the IRS sent the refund check out before he could get paid. And how much did he pay for the art? Well, he conveniently can't tell us. But what we could gather, Mr. Estill paid him $93,000 to get over $900,000 of art deductions. And the rest of the art people, the taxpayers who paid him from their refund checks, the total Mr. Carter received was something less than $160,000 as best we can calculate for $1.7 million of art deductions. But your theory wasn't that the inflation was… It wasn't necessary. For us to try to prove that the art was inflated would have involved a swearing match of experts and would have involved trying to find this art. Mr. Carter had no list of it. He had no record of it. I mean, this library in South Carolina, I remember, was one of the supposed recipients. Was there not a specific name for the library? I mean, it wouldn't be hard to… We could have found him. In fact, we knew the library. It was the Dorchester County Library. But we decided it was not worth the expense or trouble to try to locate the art, compare it to pictures, because there wasn't much writing being done. Did his bank records show that he was paying out these withdrawals to show where he was buying the art? No, the bank records wouldn't. He was paying cash. But did it show withdrawals of cash that would then explain where he got the money to buy the art from? No, Your Honor. We only checked when he brought that up about his home equity loan. There were no withdrawals around the time that the art was being purchased for these five people. But we have absolutely no record. Mr. Carter could give us no indication of what it was. The jury heard this entire story. And on the good faith defense, I wanted to say a couple of more things. The Montgomery case held that not only was the evidence overwhelming, but there was nothing in Judge Hughes' instruction that prevented the defense from placing its full defense before the jury. And I submit to you this was the same judge, roughly the same instruction, and I was involved in both of those trials, and I didn't see any difference between what Judge Hughes allowed. The defense was allowed to cross-examine the special agent and specifically asked him at trial, if a man doesn't understand the deduction, it's not a crime, is it? And the special agent truthfully answered, in most cases, no, the correct answer. Then Mr. Carter testified he didn't know the instruction. And then the defense argued it in closing in the record at pages 745 and 746, and the defense was not getting any objection from us on this. In fact, we didn't object to his instruction at all because we were trying to avoid this appellate issue. The instruction, Judge Hughes agonized over this instruction. He read Simkonen and the Pomponian case carefully. And in both of those cases, he drew the conclusion that if I instruct the jury properly on willfulness, a good faith instruction is not needed. And that's truly what those cases say. And as I read Montgomery, Montgomery, I guess, came to the conclusion if you're going to mention the word good faith, you need to lay it all out and say it can be unreasonable. I think in this case, when you consider the context of this trial and with everything that was put in front of the jury, Judge Hughes' instruction was not out in left field. It was close to what—and a valid reading of the law, but not what the 2-1 panel decision in Montgomery agreed with. And you consider the way Mr. Carter was able to testify and argue this case, that he was not deprived of getting his defense before the jury. The evidence in the case, though, is just overwhelming. I'm trying to think if there's anything else that's on your minds that you want me to address about the art. The art needs to be held for over one year. That's the capital gains rule. A year or less would make it less than fair market value. And, of course, in this case, without knowing what Mr. Carter paid for the art that he bought from people in the shadows, we would have no way to try to figure basis. In most cases, basis would be the value you could deduct on these returns. But we're not left with that. We're left with the story that we—as we told the jury in closing. What this story tells you is Mr. Carter was peddling income tax deductions during filing season. He was talking to people in the spring of the year following the tax year and arranging for payments of art that were backdated to take huge deductions, hundreds of thousands of dollars on each return, and some of the times waiting to get paid for his services from a refund check if it came. That smacks of a peddling of tax schemes, not any true art donations. And as these people testified, they didn't know these entities that the art was being donated to. They never held the art in their hands. And it just makes sense that people that have that much art to donate would have an institution they would like to direct it to or at least to see it, to hold it in their own hands. But that's not what we had in this case. I think the evidence is sufficient to sustain the convictions on the accounts on which the defendant was convicted. It's overwhelming that he did not operate with a good faith belief in what the law was. But even without that, our theory of prosecution stands under our—the conviction stands under our first theory of prosecution. If there are any other questions, I'll take them. Otherwise, I don't believe I have any more to say. Thank you, Mr. Escher. Thank you. Mr. Odom, you have five minutes or about. If it were illegal for Mr. Carter to be peddling deductions on his income tax return, I suspect that every tax preparer in this country would be guilty of advertising that they think that they could get you a deduction on their tax return. The arguments that Mr. Escher presented are factual arguments that he presented to the jury on the conspiracy count in the case in chief. At least in that respect, the jury rejected his arguments. It's interesting to note that on the tax preparers he talks about, Mr. Estelle, the defendant points out in the record on page 366 that he did meet with Mr. Estelle in 2007 and that they did talk about making these deductions. Ms. Pearson said that she could have met with the defendant in 2007 or 2008. That's in the record at 399. Mr. Patterson said he meets with the defendant in 2007 to discuss his taxes. That's in the record 442. In Hightower, the defendant claims he was referred to by his father who said he wanted to make these deductions. Now, we never went into the value of the art. The government chose not to charge that. We didn't have to defend that. They didn't present that as part of the fraud. But yet he stands before you and tells you that it's just irrational and unreasonable that you could possibly say that this jury charge didn't affect the outcome of the case because there's $1.7 million in art that was made here. Their witness, Mr. Jaro, got on the witness stand and testified that as far as he was concerned, the fair market appraisal on this art was correct. My client said the fair market appraisal value, as far as what Mr. Jaro is telling him, was correct. That was not an issue before the jury, and I don't understand why it would be an issue before this court at this particular time. But what about the checks that he brought up? Going back to the backdating theory, the checks showing 2008 payments to Carter for the art, why doesn't that corroborate the filer's testimony that this art was purchased and all this was done in 2008? It could corroborate the government's theory. Mr. Carter's explanation about those checks, however, was that, okay, we have this art. I've already purchased this art. This art will be yours. You will make the donation and you will pay me if, in fact, the donation comes through and or, in some cases, you pay me after I file the return. In the one case of Mr. Estelle, he paid Mr. Carter after the date the return was filed, but the agreement was made, I'll contribute the art, we'll make the deduction, you'll pay me later, and he did. But if Carter buys it in 07 and then in 08 they buy it from him, how do they get an 07 deduction? They get an 08 deduction. According to Mr. Carter, they purchased it. They just didn't pay him until a later date. That is what he told the jury. Now, once again, this was presented before the jury. The jury analyzed this and rejected the fact that Mr. Carter was a co-conspirator or that the defendant was engaged in a conspiracy. Now, I understand Mr. Escher saying, well, you could have an inconsistent verdict here. I think the court's question is correct. That's not what we're talking about here. We're talking about whether it was a harmless error or not. Secondly, he said, well, maybe it's because the jury thought Mr. Jara didn't fill out the tax return. Mr. Jara testified. He filled out the 8283 forms. It was his job to fill them out. Mr. Carter did not fill out those 8283 forms and submit them to the institution and then subsequently where they were submitted to the IRS. So it's as much a speculation to say that the government had overwhelming evidence of guilt on this backdating as it is to say that this not guilty on conspiracy didn't have anything to do with the backdating. Either way, it's speculation. And when doing a harmless error analysis, it's just not appropriate, I don't think. As to the issue that I could have argued and did argue that the defendant could honestly have believed that he didn't know what the tax laws were, that he could hold it a year, once again, he was entitled to know that. The jury's entitled to know that that is the law, not that some lawyer who's paid to be an advocate for the appellant is saying that. The jury's entitled to know, as Montgomery points out, to avoid the jury making a false assumption that if they thought, well, that's not reasonable for him to not know that law, therefore we will find him guilty, that's not what the law says. Therefore, the jury's entitled to be instructed on that. I think I'm out of time. Thank you, sir.